NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2112-15T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARJORIE ANNA STUBBLEFIELD,

     Defendant-Appellant.

                    **APPROVED FOR PUBLICATION**

                        **June 9, 2017**

                      **APPELLATE DIVISION**

Argued April 4, 2017 — Decided June 9, 2017

Before Judges Reisner, Koblitz and Sumners.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 13-01-0044.

James Patton argued the cause for appellant (Woolcock Patton, LLC, attorneys; Mr. Patton, on the brief).

Kayla Elizabeth Rowe, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Carolyn A. Murray, Acting Essex County Prosecutor, attorney; Andrew R. Burroughs, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

KOBLITZ, J.A.D.

Defendant Marjorie Anna Stubblefield appeals from the jury verdict convicting her of two counts of first-degree aggravated sexual assault of a physically impaired young man, D.J.,[1] who the State alleged was mentally incapacitated, N.J.S.A. 2C:14-2(a)(7). The court sentenced defendant to two concurrent twelve-year prison terms, each with an 85% parole ineligibility period, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. Defendant was also sentenced to lifetime parole supervision. Defendant argues that she was unable to fully present her consent defense given the restrictive rulings of the trial court. We agree and reverse and remand for a new trial.

The trial testimony reveals the following facts. Defendant was a professor and department chair at Rutgers University. D.J.'s brother, John, was a student in one of defendant's classes. During the class, defendant showed a movie demonstrating facilitated communication (FC), a controversial aid for the severely disabled, where the facilitator enables communication through physical assistance, such as supporting the arm of the individual to allow him or her to push a button. Whether the communication is the product of the facilitator or the disabled person may be unclear to the lay observer. Defendant was a believer in the process,

_____

[1] Initials and pseudonyms are used to protect the privacy of the victim. R. 1:38-3(c)(12).

having been introduced to it by her mother, a psychologist and retired university professor of special education. Defendant also had gained personal experience with FC, by studying the technique for three days at Syracuse University's Institute on Communication and Inclusion, and was aware of various studies debunking it as well as other studies she believed supported its efficacy.

John approached defendant, suggesting that FC might assist his younger brother, D.J., who was severely disabled with cerebral palsy. D.J. could not speak words, wore a "diaper," and needed assistance in every area of daily living. He had been adjudicated as incapacitated and his mother, Daisy, and John were appointed his joint guardians pursuant to N.J.S.A. 3B:12-25. After first attempting to obtain other help for D.J. within the family's limited ability to pay, defendant ultimately agreed to assist him. Defendant was thirty-nine years old and D.J. was twenty-nine. Beginning in 2009, defendant had sessions with D.J., originally with Daisy or John present, but eventually in defendant's office alone.

Defendant became convinced that D.J. had been misdiagnosed as having the intellectual ability of a young child. She assisted D.J. to attend FC conferences, including one in Philadelphia, with his family. Defendant also arranged for D.J. to audit a course

at Rutgers with the FC assistance of a college student, Sheronda Jones.

After two years, at the end of May 2011, defendant revealed to Daisy and John that she and D.J. had engaged in sexual intercourse and were in love. D.J. purportedly agreed, as he indicated through FC, typing on a communication device, called a NEO.[2] Defendant kissed D.J. in front of his family. Although defendant at that time was married and had two children, a few weeks after informing the family of her relationship with D.J., defendant appeared at D.J.'s family home uninvited and expressed that her future was with D.J. Daisy and John questioned whether D.J. was capable of communication and tested his ability by posing questions, which had answers known only to D.J. The answers, typed on the NEO, were inaccurate according to D.J.'s family. Believing D.J. was not communicating with defendant as she claimed, they told defendant to stop having any contact with D.J. Defendant persisted in communicating with Daisy and John, asking to see D.J. She also went to D.J.'s daycare facility and sought to see him, but was refused. The facility emailed D.J.'s family to report the attempted contact.

---

[2] A NEO is a small portable keyboard with an LED display board that shows four lines of type at a time.

In frustration, the family called Rutgers University to complain. An administrator called the Essex County Prosecutor's Office and defendant was ultimately indicted for two counts of first-degree aggravated sexual assault. Never denying that the sexual activity took place, defendant's sole claim was that D.J. had sufficient mental capacity to consent to sexual activity. She argued that the State did not prove that she knew or should have known that D.J. was too mentally impaired to consent to sexual activity. N.J.S.A. 2C:14-2(a)(7). The only evidence that sexual behavior occurred at all came from defendant's volunteered statements to her husband and D.J.'s family, as well as her detailed testimony at trial.

The State introduced three experts to testify to D.J.'s incapacitation. The first expert, Dr. Howard Shane, who had a Ph.D. in speech pathology, qualified as an expert in communication disorders, augmentative and alternative communication means and speech pathology. He conducted a three-hour assessment of D.J.'s communication level and testified that D.J. was not a candidate for augmentative communication devices because of his limited intellectual capacity. The second expert, a psychologist, first examined D.J. in 2001 for the Division of Developmental Disability, Bureau of Guardianship Services and at that time determined that D.J. required a legal guardian. The psychologist examined D.J. a

second time in 2011 to determine if D.J. had the intellectual capacity to give consent to sexual activity. He testified that D.J. did not appear capable of giving consent to sexual activities. The third expert, also a psychologist, examined D.J. for the Bureau of Guardianship Services in 2004. He testified that D.J. required a full guardian because D.J. did not have the capacity to independently make meaningful medical, legal, residential or vocational decisions.

Defendant raises the following issues on appeal:

> POINT I: THE COURT ERRED IN PRECLUDING A DEFENSE COMMUNICATION EXPERT FROM TESTIFYING ABOUT HER ASSESSMENT OF D.J.

> POINT II: THE COURT IMPROPERLY EXCLUDED EVIDENCE FROM A WITNESS WHO SUCCESSFULLY USED [FC] WITH D.J.

> POINT III: THE COURT ERRED IN PRECLUDING EVIDENCE INCLUDING DOCUMENTS PRODUCED BY D.J. THROUGH [FC] IN ANSWER TO QUESTIONS.

> POINT IV: THE COURT IMPROPERLY ADMITTED THE NET OPINIONS OF THE PROSECUTION EXPERTS ON D.J.'S INTELLIGENCE.

> POINT V: THE COURT IMPROPERLY ALLOWED THE PROSECUTION TO PRESENT AN EXPERT ON METHODOLOGY TO TESTIFY IN REBUTTAL ABOUT FC.

> POINT VI: THE CONVICTION MUST BE VACATED FOR CUMULATIVE ERROR.

> POINT VII: THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

> POINT VIII: ON REMAND THE CASE SHOULD BE ASSIGNED TO A NEW JUDGE.

The admissibility of expert testimony is governed by N.J.R.E. 702, which provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  The Rule imposes three requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Agha v. Feiner, 198 N.J. 50, 62 (2009) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

"Admissibility of scientific test results in a criminal trial is permitted only when those tests are shown to be generally accepted, within the relevant scientific community, to be reliable."  State v. Chun, 194 N.J. 54, 91 ("the Frye standard"), cert. denied, 555 U.S. 825, 129 S. Ct. 158, 172 L. Ed. 2d 41 (2008); State v. Harvey, 151 N.J. 117, 169-70 (1997) (citing Frye

v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000).[3]

A defense expert from Australia, Dr. Rosemary Crossley, defined FC in the N.J.R.E. 104 pre-trial hearing as follows:

> [FC] has two meanings, I think, in that in Australia we talk about [FC] training. And that involves providing physical support for someone while they learn to use a communication aid with their hands and to encourage the person to improve their skills and develop independent communication, but enabling them to use a communication [aid] while they do so as this can be a very lengthy process.
>
> In the United States [FC] has been used more as synonymous with supported typing, providing support to someone while they use a keyboard.

Although defense counsel asked defendant to testify before the jury about her experience with FC and her opinion as to its effectiveness, defendant does not contest on appeal the court's ruling that FC is insufficiently reliable to allow into evidence

---

[3] In 1993 the United States Supreme Court abandoned the general acceptance standard in favor of a more relaxed scientific reliability standard, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), codified in Fed. R. Evid. 702, however, the test in New Jersey continues to be whether the scientific community generally accepts the reliability of the proffered evidence. Harvey, supra, 151 N.J. at 169-70. As noted later in this opinion, defendant does not contest the trial court's application of the Frye standard to exclude expert testimony about FC.

as a scientifically recognized method of communication. Defendant argues instead that the "trial [c]ourt improperly barred defense communication expert, Dr. Rosemary Crossley, from testifying about her evaluation of D.J., and her conclusion that despite severe physical handicaps, D.J. could communicate and read." Defendant argues that the court improperly suppressed Dr. Crossley's assessment because of the court's incorrect finding that the assessment was based on FC.

Dr. Crossley is an augmentative and alternative communication (AAC) specialist, with a Ph.D. in the field from Victoria University in Australia. Since 1985, she has worked as the director of Australia's first multi-disciplinary center for AAC and has assessed "thousands" of individuals since the center began in 1977. She has written books and articles published in a peer-reviewed journal, taught university-level courses and presented at international conferences in her field. She has won various prestigious awards in Australia. The court qualified Dr. Crossley as an expert in the communication assessment of people with significant physical impairments and allowed her to testify about the deficiencies in Dr. Shane's assessment of D.J. The court did not, however, allow Dr. Crossley to testify as to her own extensive assessment of D.J.

Dr. Crossley, with the assistance of Marilyn Chadwick, a speech and language pathologist, conducted a lengthy video-recorded assessment of D.J. over three days,[4] which sought to determine his language and literacy skills and whether he had communicative intent. The assessment was conducted pursuant to an order stating: "The experts will <u>not</u> be permitted to render an opinion based on facilitated communication." Throughout the assessment, Dr. Crossley asked D.J. questions and introduced communication devices with answer options such as "yes" and "no" buttons for D.J. to choose from. Dr. Crossley also used a carpet board with attached letters, words or pictures, for D.J. to choose from when answering the questions. Dr. Crossley reported that D.J. answered forty-three out of forty-five questions correctly, thirty-nine of which required literacy skills. She testified she did not provide physical support for D.J. when he answered the forty-five scored questions.

During the twelve hours that she assessed D.J., Dr. Crossley provided communication support by using FC: touching D.J. when he was using a device that he had not used before and if D.J. became "stuck." Dr. Crossley testified, however, that nothing done with this FC support was scored as part of her assessment. She did hold the answering device, but "was very careful to hold the device

---

[4] We have reviewed this videotape.

steady so [it] didn't influence D.J.'s responses. That was helped by the fact that D.J. was using large movements. He wasn't moving a finger between two tiny targets or anything like that." Dr. Crossley testified that she was compelled to hold the devices because she had no stand at the proper height, and it is common for evaluators to hold the device in these circumstances. The defense argued that the results of her assessment were sufficiently reliable to present to the jury, and the court erred by suppressing Dr. Crossley's evaluation, both her conclusions and the supporting videotape.

The admissibility of Dr. Crossley's testimony about her assessment of D.J. hinged on whether or not the techniques employed during her assessment amounted to FC, which the court had already ruled inadmissible due to its unreliability. The State alleged that holding the devices skewed the results and therefore the entire evaluation was based on FC. Because Dr. Crossley held the device on which D.J. rendered his answers, the State argued that she used FC even when she asserted she was not doing so. Dr. Crossley disagreed with this broad definition of FC. Relying on the State's cross-examination of Dr. Crossley as well as the court's own evaluation of the videotape, the court did not allow the jury to see any portion of the videotape of Dr. Crossley's

extraordinarily lengthy evaluation, nor even hear that she had performed an evaluation.

The trial court found that Dr. Crossley satisfied the first and third elements of N.J.R.E. 702, but did not satisfy the second element because she used FC during the assessment. The court stated:

> In effect, the methods and data Dr. Crossley[5] relied upon were similar to facilitated communication rendering her analysis invalid and indicating that she does not have the expertise necessary to offer testimony regarding the methods and principles she applied to D.J.
>
> . . . .
>
> There is, in short, no showing that the scientific tests performed by Dr. Crossley were sufficiently reliable. The tests Dr. Crossley administered were based on facilitated communication methods and principles, which the Court had already ruled as inadmissible.
>
> . . . .
>
> Portions of the video, which the Court had viewed in its entirety seems to indicate that she may have assisted D.J. in moving the device rendering her methods of testing D.J.'s ability to communicate invalid. I find that the methods she used to examine D.J. were flawed and thus, the conclusion she has drawn from her flawed examination marks her opinion not reliable, and thus, a net opinion.
>
> . . . .

---

[5] We have corrected the transcriber's misspelling of Dr. Crossley's name throughout.

Given her testimony and the video tape proceedings of the method and principles to assist D.J. in communicating the Court is of the opinion that the procedures were not reliable methods. For the foregoing reasons the Court will deny expert testimony from Dr. Crossley because the methods and principles used to assess, whether a means exist for D.J. to communicate are based upon insufficient and unreliable data.

Additionally, the Court finds that the testimony from Rosemary Crossley is inadmissible since insufficient and unreliable data forms the basis of her testimony.

The Court believed Dr. Crossley's reports and examinations are inadmissible because her communication assessment is based upon an unrecognized field of science known as facilitated communication rendering Dr. Crossley not an expert and her opinion inadmissible as a net opinion.

The court did not address the specific forty-five questions scored by Dr. Crossley, which she testified were answered by D.J. without the use of FC.

During an April 24, 2014 hearing on defendant's unsuccessful motion to subject D.J. to additional testing, the court noted that after viewing the twelve-hour videotape of Dr. Crossley's assessment, it was incredulous of defendant's claim that D.J. was responsive and intentionally selected options during the assessment. The court stated:

[W]hat I have in front of me, are basically two opposing reports. I have the reports and

the rebuttals from Marilyn Chadwick and Dr. Crossley, and I have the report from Dr. Shane. There are -- I looked at the video for what both aspects said. And the things that often they saw as a direct response, I didn't see it as that. I saw it as you're holding the device very closely to his right hand, he tends to favor his right hand and he hit it. As soon as he hit it, it was pulled away. But my guess is, and it has happened on other occasions, if you left it there longer, he might slip and hit the no also.

. . . .

I think there are instances that it appeared that he may have responded. And I think there were instances that I saw that there was allegedly a positive response in which I saw, and I just did not -- I didn't see how that could be a positive response.

The court further noted that even if D.J. was able to communicate on some level, D.J. was unlikely to have sufficient intellectual capacity to give consent to sexual activity. The court said it based its opinion on the parties' submissions, the videotaped assessment and twenty years of medical specialists' reports deeming D.J. incapacitated.

We agree with defendant that by preventing Dr. Crossley from presenting her evaluation of D.J., defendant was precluded from fully presenting her defense. The jury and not the court should have ultimately determined whether Dr. Crossley's evaluation was persuasive, and whether the State proved defendant knew or should have known that D.J. could not consent.

The court's overly exclusionary ruling deprived defendant of an opportunity to present evidence supporting her defense.  See State v. B.M., 397 N.J. Super. 367, 378-79 (App. Div. 2008) (stating that it was appropriate for the trial court to allow defendant latitude in presenting a defense); see also State v. Garron, 177 N.J. 147, 169 (2003) (stating that "when the mechanistic application of a state's rules of evidence or procedure would undermine the truth-finding function by excluding relevant evidence necessary to a defendant's ability to defend against the charged offenses, the Confrontation and Compulsory Process Clauses must prevail"), cert. denied, 540 U.S. 1160, 124 S. Ct. 1169, 157 L. Ed. 2d 1204 (2004).  "Although a trial court retains broad discretion in determining the admissibility of evidence, that discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury." State v. Cope, 224 N.J. 530, 554-55 (2016).

The State exacerbated this error by arguing to the jury in summation:

> Now, also with regard to mental defectiveness, it's important to note that we heard from a lot of experts, we've heard from many lay witnesses, we heard from Daisy and John, and we heard from the defendant.  The only person who came into this courtroom, and took this stand, and told you -- and testified to you that he is not mentally defective and that he has the capacity to consent to sexual activity

A-2112-15T1

> is the defendant. That's it. Nobody else came in here from that stand and told you that he was not mentally defective.
>
> . . . .
>
> [T]he person that comes here to contradict [Dr. Shane] is Rosemary Crossley from Australia, who again you didn't hear any testimony from her about an examination she conducted; it was a critique again of Dr. Shane.

The State argued to the jury that the judicial order of incapacitation, coupled with the four expert witnesses produced by the State, overwhelmed the lone witness to D.J. having the capacity to consent, defendant, who did not have the expertise or objectivity to render such an opinion. The jury was left with no evidence that any other lay or expert person believed D.J. to have the intellectual capacity to consent to sexual activity.

In summary, both these errors deprived defendant of a fair trial. The court erroneously used its own assessment of the videotaped interaction between Dr. Crossley and D.J. to deny defendant the opportunity to convince the jury that Dr. Crossley's evaluation was accurate and not based on FC. The State's misleading summation stressing the lack of a defense evaluation exacerbated the harm caused by this ruling. See State v. Bradshaw, 195 N.J. 493, 510 (2008) (stating that a prosecutor "should not make inaccurate legal or factual assertions during a trial").

The court also prevented Sheronda Jones from testifying that D.J. completed his audited course requirements through FC. Because FC was found scientifically unreliable, the court prevented Jones from testifying that she assisted D.J. through FC to audit this course. Thus, the jury did not hear Jones's observations of D.J.'s communication and intellectual capabilities. She was allowed to testify only that she turned pages for D.J. Jones was a lay witness who had spent considerable time with D.J. She could have testified to her observations of D.J.'s mental capacity without a scientific endorsement of FC, just as Daisy and John testified to their experience with D.J.'s incapacity. See N.J.R.E. 701.

III

Finally, in another effort to exclude FC from the facts presented to the jury, the court unfairly limited defendant's opportunity to cross-examine John or to rebut portions of his testimony. The court denied defendant the opportunity to present evidence of the answers generated when John asked D.J. questions. After defendant disclosed her sexual relationship with D.J., as a test of D.J.'s mental ability to communicate, John asked D.J. certain questions about their family history, the answers to which were allegedly known to D.J., but unknown to defendant. John's purpose in asking the questions was to determine whether the

communication produced by D.J. with defendant facilitating actually originated from D.J. or defendant. The first question John posed was: "Who is Georgia?" With defendant facilitating, D.J. purportedly answered on the NEO: "John, Georgia in high school worked for mom." The second question was: "Who is Sally?" Again with defendant facilitating, D.J. purportedly answered on the NEO: "Georgia in our family circle is mom's little nephew's ki," leaving the last word unfinished.

John testified that the answers typed were incorrect, but was not allowed to testify as to the content of the answers. According to John, Georgia is John's aunt's sister. John testified that Sally and Georgia are the same person because Georgia was also known as "Sally." Defendant contends that D.J. correctly answered the questions with facts that were unknown to her. She asserts that Georgia did take care of D.J. when he was high school age, and she is in the "family circle" and is therefore "kin." Defendant argues that the test was powerful evidence that D.J. was actually communicating with FC. The court allowed defendant to testify generally that she believed D.J. answered correctly, but did not permit introduction of the printout answers.

Defendant argues on appeal that the trial court erred by not allowing John and Daisy, two witnesses to the questions and answers, to testify to the answers given. She also argues that

the court erred by ruling that the printout of the typed answers was inadmissible because it was hearsay and produced through FC. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). The answers typed on the NEO are not hearsay, as the type-written printout is proof of what was typed at that moment in response to the posed questions. "As a general proposition, '[w]here statements are offered, not for the truthfulness of their contents, but only to show that they were in fact made and that the listener took certain action as a result thereof, the statements are not deemed inadmissible hearsay.'" Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 376 (2007) (quoting Russell v. Rutgers Cmty. Health Plan, 280 N.J. Super. 445, 456-57 (App. Div.), certif. denied, 142 N.J. 452 (1995)). Defendant sought to introduce the printout to prove that it was produced at that time, not for the accuracy of its contents. The witnesses, defendant, John and Daisy, would have to testify whether what was typed was accurate or not. The jury could then determine whether or not the printout lent credibility to defendant's claim that D.J. could communicate with her.

Unfortunately, the court, in its attempt to cleanse the record of controversial FC methodology, limited the evidence to the extent that defendant was not given a fair opportunity to present her defense.

When defendant testified about FC as an expert would, contrary to the court's express direction, the court allowed a fourth State's expert, another psychologist, to testify in rebuttal about the fallacy of such purported communication. The State's fourth expert enhanced the impression that defendant alone claimed to believe in FC, without any expert or lay witness in agreement, just as the State argued in summation. The court's prime responsibility is to ensure a fair trial, and here the court should have allowed some latitude to defendant in presenting her defense. "[I]f evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." Garron, supra, 177 N.J. at 171.

The factual setting here was extraordinary, and it called for a liberal admission of evidence supporting defendant's defense to allow her the opportunity to convince the jury of the reasons for her unorthodox perception of D.J.'s capabilities. The jury was not presumptively gullible. It did not have to be shielded from employing its common sense to fairly evaluate the testimony

from both sides.[6] See Cope, supra, 224 N.J. at 553. The court's observations of Dr. Crossley's videotaped evaluation were no better than the jury's observations would have been. Without objection, the State displayed D.J. to the jury, presumably so it could better understand the extent of his disabilities. Reviewing the videotape, or at least the portions of it Dr. Crossley testified did not involve FC, would have been a better way to allow the jury to assess D.J.'s communicative skills.

In conclusion, based on our careful consideration of the trial record, we are persuaded that due to cumulative error, defendant did not receive a fair trial. State v. Weaver, 219 N.J. 131, 155 (2014). Defendant's remaining arguments, regarding the State's experts, are without sufficient merit to discuss in this opinion. R. 2:11-3(e)(2).

We thus reverse these convictions. When sentencing defendant, the court stated: "I find that the actions of the defendant are the perfect example of a predator preying on their prey." In an excess of caution, we remand for a new trial before a different judge. At the new trial, the court should allow Dr. Crossley to testify regarding her evaluation of D.J. and play the

---

[6] In making these observations, we do not intend to suggest our own view of the evidence. Our purpose is to emphasize that, regardless of a trial judge's view of the weight a party's evidence deserves, the judge should trust the jury to evaluate witness credibility and decide what weight to give each side's evidence.

relevant portions of the videotape covering the scored questions and answers. Jones should also be permitted to testify as to her interactions with D.J. and her general observations of D.J. If, after defendant is given the chance to fully explain her position, it then becomes appropriate, the State may present rebuttal, as it did in the first trial.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION