**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2256-15T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EARNST WILLIAMS, a/k/a
ERNEST WILLIAMS,

    Defendant-Appellant.

_____

        Argued May 2, 2018 — Decided May 21, 2018

        Before Judges Fuentes, Koblitz and Suter.

        On appeal from Superior Court of New Jersey,
        Law Division, Essex County, Indictment No.
        13-03-0574.

        Brian P. Keenan, Assistant Deputy Public
        Defender, argued the cause for appellant
        (Joseph E. Krakora, Public Defender, attorney;
        Mark H. Friedman, Assistant Deputy Public
        Defender, of counsel and on the brief).

        Lucille M. Rosano, Special Deputy Attorney
        General/Acting Assistant Prosecutor, argued
        the cause for respondent (Robert D. Laurino,
        Acting Essex County Prosecutor, attorney;
        Lucille M. Rosano, of counsel and on the
        brief).

PER CURIAM

Defendant Earnst Williams appeals from his December 14, 2015 conviction for felony murder, N.J.S.A. 2C:11-3a(3), for which he was sentenced to fifty years in prison with an 85% parole disqualifier and a five-year parole supervision term pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The State and defendant agreed that the victim was shot and killed after meeting defendant in an apartment building to buy oxycodone pills. The State's theory was that defendant shot the victim during the course of a robbery. Defendant testified that he was intending to sell the victim the drugs, but the victim tried to shoot defendant and defendant wrested the victim's gun away and shot the victim in self-defense. We reverse because the trial judge did not allow defendant to introduce relevant exculpatory evidence of the victim's prior drug purchases.

Defendant was indicted for first-degree murder, N.J.S.A. 2C:11-3a(1) (count one); first-degree felony murder, N.J.S.A. 2C:11-3a(3) (count two); first-degree robbery, N.J.S.A. 2C:15-1 (count three); second-degree conspiracy to rob, N.J.S.A. 2C:5-2 and 2C:15-1b (count four); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b (count five); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4a (count six); and third-degree conspiracy to violate the narcotics laws, N.J.S.A. 2C:5-2, N.J.S.A. 2C:35-5, and N.J.S.A. 2C:35-10 (count

seven).  Count four was dismissed prior to trial.  Defendant was convicted of aggravated manslaughter, N.J.S.A. 2C:11-4(a), as a lesser included offense of murder in count one and convicted of all other counts.  The judge merged all other convictions into count two, felony murder.

At trial, Craig[1] testified that on July 22, 2015, Barry, a 22-year old Connecticut resident, contacted his friend John to ask if he knew anyone selling oxycodone pills.  John put Barry in touch with his next-door neighbor, defendant.  Barry, who planned to drive from Connecticut with his friend Craig to buy the pills, asked defendant if they could meet halfway, but defendant refused and set up a meeting in Montclair.  Barry then asked to meet in a "public place, like a grocery store," but defendant again declined, setting up a meeting on a street in Montclair.

When Barry and Craig arrived at the address, defendant entered the car.  The two buyers asked to see the drugs.  Defendant answered that the drugs were at his girlfriend's apartment.  He also insisted that Barry bring all the money.  Barry took $900 and walked into the building with defendant.  Craig heard two gunshots coming from inside the house.

Craig called Barry's cell phone number, and when he received no answer, he "drove away frantically . . . hysterical, afraid for

---

[1]  We use pseudonyms for the names of the victim and witnesses.

[his] life." Three witnesses testified that they saw defendant and another man fitting Barry's description go inside the building and then heard gunshots.

On the same date, Rob, who drove a taxi for Montclair Yellow Cab, "pick[ed] up a guy," who he identified as defendant, sometime between 6:30 and 7:30 p.m., and took him to Newark. Defendant's cousin Rose initially testified that she could not remember what happened. After being confronted with her police statement, she remembered that defendant came to her home in Newark by taxi at about 7:30 p.m. and asked to use her telephone. Defendant then met with "about three or four" men outside. She heard what she "guess[ed] was [defendant's] voice" saying "I robbed him."

Defendant's friend John,[2] his daughter, defendant's brother, and a friend drove to Newark and saw defendant sitting on his cousin's stoop "with his head down." Defendant stated that "shit went wrong." Defendant admitted to John that he was trying to rob Barry and that defendant brought the gun to the scene, but he also claimed that it was Barry "who reached to the gun," after they began "tusseling" and "fighting." He told John that "he shot down on [Barry's] leg. And then he shot him again." He said he took "some" money from Barry, tossed the gun away, and left the scene.

---

[2]   John pled guilty to count seven, third-degree conspiracy to distribute drugs, agreeing to testify against defendant in exchange for a probationary sentence.

Footage from two businesses' security video cameras in the area showed Craig's vehicle turning onto the street, and one showed defendant walking, carrying a T-shirt. Barry's cell phone contained several text messages with defendant regarding the terms of the sale and where the transaction would take place. Barry texted defendant "I'm not giving you the money up front, letting you go back into the house. I'll park on the street and you can just bring them to the car. I'll count them and give you the cash." He also texted defendant, "I don't need to come into the house. . . . You got to understand, I'm not gonna go in the house where I've never been without seeing all the pills first. . . . You got to work with me. Let me know I'm safe."

Defendant spent the night after the killing at his cousin Rose's home. She had a conversation with defendant the next day in which he stated he "did something in Montclair . . . [H]e robbed a [Caucasian] man in Montclair and they got into a little scuffle and that he shot him" twice, once in the leg and once in the head. She stated that "he was supposed to meet up with a guy to make a [drug] transaction," but that he had no drugs to sell and, instead, intended to "rob him." Rose then stated that during this account, defendant took out $400 and counted it.

Defendant testified at trial that, in preparation for the drug sale, he had stashed oxycodone pills in a shoe that he left

in the second floor hallway.  He walked up to the second floor landing, put the pills in his pocket, and as he was "walking down, [Barry] pull[ed] a gun out.  So I dove on [Barry]. . . . I bit [him] . . . . I'm [in] fear for my life . . . . I know he got shot . . . . I know he got hit again . . . . I never had total control." He took the gun from Barry, ran from the building, but denied taking any money from him.  He further denied that he had ever planned to rob Barry.

Defendant said he walked towards his mother's home, removed his T-shirt, wrapped the gun in it, threw it away into a garbage can, and later sold the drugs he was carrying for $500 to another buyer.  He took a shower, went to Newark, met John, and told him what happened.  The next day, his father came to pick him up, and he turned himself in at the Essex County Prosecutor's Office.  He admitted that he did not have a girlfriend at the address where he arranged to sell the drugs, but chose that building because it was quiet, the front door was always open, and he was "familiar with the format."  He did not want to conduct the sale in the local business areas because a "police station [is] right there," nor did he want to sell drugs in his own home.

Barry died as a result of a gunshot wound to the head.  He was also shot in the abdomen, and the bullets found in both wounds were fired from the same .38 caliber pistol.  He was found with

$500 in his pocket. DNA testing confirmed that defendant bit Barry's right forearm. Barry had oxycodone in his blood.

On appeal, defendant argues:

> POINT I: THE TRIAL COURT ERRED PREJUDICIALLY BY REFUSING TO ALLOW THE DEFENSE TO CROSS-EXAMINE [CRAIG] ABOUT HIS STATEMENTS TO THE POLICE REGARDING HIS AND [BARRY]'S PRIOR DRUG TRANSACTIONS WITH [JOHN] AT PALISADES [CENTER], WHICH WERE RELEVANT TO AND SUPPORTIVE OF DEFENDANT'S SELF-DEFENSE CLAIM.

> POINT II: DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE.

Defendant argues that Craig's statements concerning Barry's prior drug purchases in a public place enhanced the evidence of Barry's "security concerns" when purchasing drugs. Defendant points to Craig's admission to police that the two young men had "very smoothly" purchased drugs about three times from John at Palisades Center where, as here, Craig dropped off Barry and waited for him in the car until Barry called. Craig further told the police that leading up to this trip, Barry tried to convince defendant to meet him at Palisades Center, but when defendant claimed he "didn't have a ride," Barry suggested a meeting in a public place. The text messages on Barry's phone substantiated this evidence.

The State responds that Barry's concern for conducting drug transactions in public places does not mean that he carried a gun to this transaction inside a private home. We agree that the

7

excluded evidence does not prove Barry brought the gun; the question is whether this evidence supports defendant's affirmative defense. Defendant testified that he had no intention of robbing Barry, and that he planned to sell oxycodone pills. Barry's state of enhanced vigilance, stemming from the drug transaction out of public view, was somewhat supportive of the defense that Barry brought a gun to the sale. The jury found defendant guilty of aggravated manslaughter and not murder. Thus the jury did not find that the State proved the murder charge against defendant, to wit, that defendant did not "knowingly" or "purposely" caused Barry's death. See N.J.S.A. 2C:11-3a(1) or (2).

The trial judge misapplied the heavy burden against admission of the State's evidence under State v. Cofield, 127 N.J. 328, 338 (1992) and N.J.R.E. 404, ruling that defense counsel could not cross-examine Craig about a December 2011 transaction because defendant had failed to present sufficient evidence to show the meeting occurred or that it was similar to the July 22, 2012 incident. The strict Cofield standard, however, is appropriate only when the State seeks to introduce evidence of other crimes against defendant.

The "relaxed" standard for the admission of defense evidence of prior criminal activity is set forth in State v. Weaver, 219 N.J. 131, 150 (2014). The admissibility of other-crimes evidence

used defensively is governed by Rule 401, and the standard is "simple relevance to guilt or innocence." Weaver, 219 N.J. at 150. Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401; State v. Williams, 190 N.J. 114, 122-23 (2007). "It is well established that a defendant may use similar other-crimes evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him." State v. Garfole, 76 N.J. 445, 453 (1978); State v. Cook, 179 N.J. 533, 566-67 (2004).

If relevance is established, the court must undertake a Rule 403 analysis. Weaver, 219 N.J. at 151. "[T]he question . . . is not relevance as such, but the degree of relevance balanced against the counter considerations expressed in [N.J.R.E. 403] of undue consumption of time, confusion of the issues and the misleading of the jury." Id. at 157 (quoting Garfole, 76 N.J. at 451). The State argues that the evidence would be confusing and misleading and that Craig's "testimony would have also prejudiced the State's case by 'muddying' the victim's character with unsubstantiated allegations of violent behavior." The jury heard evidence that Barry had oxycodone in his system, and that he wanted to conduct this drug transaction in a public place. The additional evidence

of a prior drug transaction occurring in a mall would not have been unduly time-consuming, confusing or misleading.

"Although a trial court retains broad discretion in determining the admissibility of evidence, that discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury." State v. Stubblefield, 450 N.J. Super. 337, 348 (App. Div. 2017) (quoting State v. Cope, 224 N.J. 530, 554-55 (2016)). The trial judge's ruling precluding defense evidence was a clear error of judgment resulting in a manifest denial of justice. See State v. Morton, 155 N.J. 383, 454 (1998) (expressing the standard of review of an evidentiary ruling).

We have considered whether the improper preclusion of evidence sought to be admitted by the defense should be considered harmless error. R. 2:10-2. In a murder case where the defendant testifies and provides an alternate version of the facts, the preclusion of evidence supporting the defense version is not likely to be harmless. "If there is a 'reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits,' State v. Macon, 57 N.J. 325, 338 (1971), a new trial is required. Because defendant objected at trial, the harmful error standard applies. R. 2:10-2." State v. Bradshaw, 195 N.J. 493, 509 (2008). We therefore reverse.

Because we reverse defendant's convictions, we need not address his sentence. We do note, however, that the judge erred in considering defendant's prior record of arrests as a juvenile and adult as an important consideration. Our Supreme Court has instructed us in a Pre-trial Intervention context that the prosecutor may not consider an individual's history of arrests as an indication of unlawful behavior. State v. K.S., 220 N.J. 190, 199 (2015). In the sentencing context, certainly defendant's juvenile and adult arrests that did not result in convictions should not have been considered as indicia of unlawful behavior. Defendant had been convicted of six drug-related disorderly persons offenses, but had no juvenile adjudications of delinquency or indictable criminal convictions.

After reviewing in detail defendant's arrest record, beginning in 2007 when he was a juvenile, the judge commented on the severity and frequency of the charges. She said: "There is an ample record of [defendant's] criminal activity prior to the events in this matter. He has a criminal history which includes numerous arrests and was, by his own admission, a drug dealer by trade." When considering arrests for the purposes of sentencing, even prior to K.S., they might be considered as an unsuccessful deterrent to criminal activity, or for some other relevant purpose, but "[t]he important limitation of course is that the sentencing

judge shall not infer guilt as to any underlying charge with respect to which the defendant does not admit his guilt." State v. Green, 62 N.J. 547, 571 (1973).

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION